# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
January 4, 2001 Session

## KRISHINA DENIA LEACH, ET AL. v. METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 97C-866    Thomas A. Brothers, Judge**

---

**No. M2000-01487-COA-R3-CV - Filed November 15, 2002**

---

This is a Tennessee Governmental Tort Liability Act case. A tow truck owned and operated by an employee of the Metropolitan Government of Nashville and Davidson County was traveling northwardly on Second Avenue South when it struck and killed Jacob Leach, age three, and seriously injured his mother, Krishina Leach. Jacob and his mother were walking southwardly on the sidewalk when Jacob broke free of his mother's restraint and darted into the path of the truck. The trial judge concluded that the driver of the tow truck was negligent because he "should have seen what was there to be seen." The judgment is reversed upon a finding that a motorist is under no duty to assume that an escorted child, in the restraint of an adult, will suddenly break free and run into traffic.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed**

BEN H. CANTRELL, P.J., M.S., WILLIAM C. KOCH, JR., J., AND PATRICIA J. COTTRELL, J.

John L. Kennedy, Daniel W. Champney, and Lora A. Barkenbus, Nashville, Tennessee, for the appellant, Metropolitan Government of Nashville and Davidson County.

Lee Ofman, Franklin, Tennessee, for the appellee, Krishina Denia Leach.

Terrance E. McNabb, Nashville, Tennessee, for appellee Richard Dale Moore.

## OPINION
## PER CURIUM

Second Avenue South is a two-lane one-way street in Nashville. There is a bus stop located near the intersection of Second Avenue South with Hart Avenue. On December 23, 1996, the plaintiff, Krishina Leach [Ms. Leach], and her three-year-old son, Jacob, were on the sidewalk on the East side of Second Avenue headed for the bus stop. Ms. Leach was holding Jacob's hand, but he pulled away from her and ran into Second Avenue. Ms. Leach pursued him, and both were struck by a tow truck owned by the Metropolitan Government of Nashville and Davidson County and

operated by its employee, William Heer, Jr. Jacob was killed and his mother was seriously injured. She and the father of Jacob, Richard Moore, filed suit against the Metropolitan Government of Nashville and Mr. Heer[1] for the alleged wrongful death of Jacob. She also sued to recover damages for her injuries. The action was filed pursuant to the Tennessee Governmental Tort Liability Act, Tenn. Code Ann. § 29-20-101, and was tried without a jury. The trial court held: (1) because there was no proof of comparative fault on the part of Krishina Leach, the principles of comparative fault were inapplicable; (2) a three-year old child cannot be charged with negligence; (3) there was no evidence that Mr. Heer was speeding; (4) that the presence of children is a warning to the operators of vehicles to drive with due care; (5) that Mr. Heer was familiar with the accident area and knew that children were frequently in that area; (6) that Mr. Heer had an unobstructed view of 300 feet and should have seen Jacob and Ms. Leach from that distance. The maximum amounts allowable under the TGTLA were awarded. The defendant appeals and presents for review, as restated, the issues of whether the evidence preponderates against the judgment, and whether the court erred in exonerating Ms. Leach from negligence. Our review is *de novo* on the record with a presumption of correctness unless the evidence preponderates against the judgment. Rule 13(d), Tenn. R. App. P.

## The Evidence

### I.

William Heer was an employee of the defendant on the day of the accident. He was driving a tow truck, towing a pick-up truck, northbound on Second Avenue South. As he approached the intersection of Hart Street, he was traveling northwardly in the left-hand lane. He was familiar with the residential area and was aware that children lived there; that traffic was not heavy; that Second Avenue South is a thoroughfare; that as he proceeded north on Second Avenue he did not clearly see the mother and child on the sidewalk, except peripherally; that the child was in the middle of the right-hand lane, about 75 feet away, when first seen, and that he immediately applied his brakes, but struck both mother and child.

He testified that he saw the mother at the same time he saw the child. The child was running but Mr. Heer was not asked further about the mother.

### II.

Officer Keith Sutherland investigated the accident. He testified that the speed limit on Second Avenue South was 35 miles per hour, that there was no evidence that the tow-truck had exceeded the speed limit, and that he measured skid marks of 128 feet.

---

[1] The action against Mr. Heer was dismissed upon his motion asserting immunity from suit pursuant to Tenn. Code Ann. § 19-20-310(b).

**III.**

Tom Hayes testified that he was following the tow truck, and saw Jacob and his mother on the sidewalk from a distance of 150-300 feet. Jacob was pulling against his mother's hand "as if he wanted to cross the street," and suddenly he pulled free and ran into the street, directly in front of the tow truck.

Mr. Hayes testified that he was traveling about 30 miles per hour when he saw Jacob trying to get his hand loose. He described the tow truck as being driven in a slow and cautious manner, and that the driver "did all he could do to avoid Jacob."

**IV.**

Bill Keller testified that he was driving about 300 feet behind the tow truck, which was moving slowly. He first saw Jacob when he began to run across the street into the path of the tow truck.

**V.**

Each party employed accident reconstruction experts.

Ms. Leach had no recollection of the accident, and we must look to the testimony of Mr. Heer, Mr. Hayes and Mr. Keller for a determination of the issue of liability.

**Analysis**

The trial judge stated, in effect, that he could not determine that Mr. Heer was driving too fast for conditions, "but that he should have been aware of what was in his view," and was "negligent in not carefully looking and not seeing what was there to be seen."

"What was there to be seen" was Ms. Leach and Jacob walking southwardly on the sidewalk. The thrust of the argument in support of the judgment is that Mr. Heer should somehow have anticipated that Jacob would pull loose from his mother's clasp and dart into the street when Mr. Heer was 75 feet away. The issue is not whether Jacob was negligent: he was not, because as a matter of law he cannot be negligent. *Walkup v. Covington*, 73 S.W.2d 718 (Tenn. 1933). But even in cases involving children, foreseeability is the test of negligence, *Tompkins v. Annie's Nannies Inc.*, 59 S.W.3d 669 (Tenn. Ct. App. 2000), and in light of the evidence in this record it cannot be reasonably said that Mr. Heer should have anticipated that Jacob would disengage himself from his mother and dart into the street. Stated differently, it was not reasonably foreseeable that Jacob would break free of his mother and run into the street.

To maintain a suit for common law negligence the plaintiff must establish a duty of care owed by the defendant, conduct falling below the applicable standard of care amounting to a breach

of that duty, an injury or loss, causation in fact, and legal cause. ***McClenahan v. Cooley***, 806 S.W.2d 767 (Tenn. 1991).

Ms. Leach argues that Mr. Heer was aware of the likely presence of children, which heightened his duty of care. We agree. In most jurisdictions, including Tennessee, the law imposes upon a driver the duty of care to consider childish behavior and take appropriate precautions. ***Staley v. Harkleroad***, 501 S.W.2d 571 (Tenn. Ct. App. 1973). In the off-cited case of ***Townsley v. Yellow Cab Co.***, 145 Tenn. 91, 237 S.W. 58 1921), the Supreme Court held "children, wherever they go, must be expected to act upon childish instincts and impulses; and others who are chargeable with a duty of care and caution towards them, must calculate upon this and take precautions accordingly."

In light of all the circumstances, we reproduce the salient testimony of Mr. Herr, and the two eye witnesses, Mr. Hayes and Mr. Kellar:

### Mr. Heer

Q.      What is the normal speed range for that wrecker when you're driving in third gear?

A.      Uh 25 to 35.

Q.      If you try to go faster what happens in that gear?

A.      You'll just be over revving the truck.

Q.      Alright. At anytime when you came down the hill toward Hart Street did you over rev the truck?

A.      No sir.

\* \* \* \* \*

Q.      Did you accelerate fast as you came down the hill on Second Avenue?

A.       No sir.

Q.      As you approached the intersection of Hart Street, what, to the best of your recollection, was your speed?

A.      Right around 30 miles an hour or less.

Q.      Okay and at some point did you see a child run into the street?

A.      Yes sir.

Q.      Did you notice a child and his mother before he ran into the street?

A.      Just merely to the – out of – you know not as far as focusing actually on them but just knowing, I don't know, like an image there to the side.

Q.      Okay. Well when you saw the child, was he running from right to left or left to right?

A.      From right to left.

Q.      Alright and prior to the time – Now you mentioned something about noticing something off to your side. Did you notice

something off to your right hand side before you knew there was a child there.

A. Yes sir.

Q. Was it, could you describe that?

A. It's just like knowing something's there, not really knowing exactly what it is, you know, whether it be – just anything, just knowing something different is there.

Q. Are you familiar with the term peripheral vision?

A. Yes sir.

Q. What do you understand that to mean?

A. Like stuff in your side vision. Like you know I can see the, I know the Judge is right here, I mean I'm not actually focused on him but I can see him.

\* \* \* \* \*

Q. And if you could tell the Court, if you can, about how long time period, for a period of time was this image in your peripheral vision?

A. Maybe a second.

Q. . . . At some point, were you aware that there was actually a child running in the street?

A. Yes sir.

Q. And where was the child in relation to the street lanes when you recognized that there was a child running?

A. He was half way across the right hand lane.

Q. Okay. And were you approaching the intersection of Hart Street at that point?

A. Yes sir.

Q. And how fast were you going when you saw the child running?

A. Approximately 28 to30 miles an hour.

Q. Alright. What did you do?

A. As soon as I focused on that it was a child and he was running as fast as he could right into my path I just jammed on the brakes and swerved to the left as hard as I could to keep from hitting him.

\* \* \* \* \*

Q. Once you saw the child, did he appear to be running fast?

A. Yes.

Q. . . . [P]rior to the collision with child, did you see or recognize what we now know as his mother following him?

A. Just kind of in the peripheral vision, not really – you know once I saw him I was just focused on him cause anything behind him I knew if I tried and missed him that I wouldn't

have to worry about anything further to the right.  I was just focusing on him trying to miss him.

\* \* \* \* \*

Q.    And I'm going to ask you how much time passed from the time you first saw the child until he disappeared in front of your, in front of your hood?

A.    It was like two seconds.

\* \* \* \* \*

Q.    To the best of your knowledge, were the brakes on the truck functioning properly.

A.    Yes sir.

\* \* \* \* \*

Q.    As you think back, can you think of anything more you could have done to prevent this?

A.    No sir.

## Mr. Heer on Cross

\* \* \* \* \*

Q.    You have gone through that area more than 50 times prior to the accident, right?

A.    Yes sir.

Q.    Probably more than 100 times, haven't you?

A.    Maybe.

Q.    And, you were aware that children lived in that area, right?

A.    Yes sir.

Q.    Now when you first saw the child there was (sic) no vehicles obstructing your vision between you and the child, isn't that correct?

A.    That's correct.

Q.    And isn't it also correct that you never saw the child come off the sidewalk on the right hand side of the street?

A.    That's correct.

Q.    And isn't it also true that when the child came off the sidewalk from what you saw him, in terms of his path, he came directly across the street?

A.    Yes sir.

\* \* \* \* \*

## Mr. Hayes

Q.    Now you were coming down Second Avenue and were you – what was the traffic like?  Was it heavy, was it light?

A. . . . [T]here were four or five cars. I know there was one just to my right, possibly back just a little bit and the wrecker was in front of me and then there were a couple of more cars behind.

Q. Alright. Show the Judge on that map where you were and where the wrecker was as y'all approached the area where the, the, uh, incident occurred.

A. . . . I was probably right along in this area there somewhere and the wrecker was about three car lengths in front of me.

* * * * *

Q. Now, if you're traveling the direction that you were traveling, in the lane that you were traveling, that is the left hand lane, and you were looking at pedestrians on the sidewalk in this area right in here, that I'm pointing to by this telephone pole.

A. Um-hm.

* * * * *

Q. . . . As you were approaching the area that, that, uh, ultimately was the, uh, in-incident where Jacob was killed. As you were approaching that area, uh, could you see the mother and the child standing there on the curb?

A. Uh, yes.

* * * * *

Q. Could you clearly see Jacob and Krishina?

A. Yes.

Q. At the time that you saw Jacob and Krishina and prior to Jacob running into the street, did you begin to slow down?

A. Yes.

* * * * *

Q. Okay. Do you know how fast the other cars were going?

A. . . .[I]f you not – probably not any faster than I was, uh, there may have been some overtaking me from the rear but the car on the right was running about the same speed.

Q. Tell the Judge in your own words what you saw with Krishina Leach and Jacob just prior to Jacob running into the street.

A. Well they appeared to be coming down the sidewalk from this area down there to that point and, uh, she was holding his hand and it, uh, he was apparently giving her some resistance about, uh, going home. He wanted to go back in the other direction and he pulled back and pulled his hand away from her and she turned around and started back up the sidewalk towards him and I thought for a moment he was going to run back up the hill on the sidewalk and he turned around in the street and she went after him.

Q.     From where you were driving in your car, did you have clear view of this?

A.     Yes.

Q.     And when Jacob ran into the street did his mother run right after him?

A.     Uh, yes.

Q.     Okay.  Now at the time that, at the time that, uh, Jacob ran into the street and his mother pursuing, you were directly behind Mr. Herr, the defendant in this case, is that right?  Uh, the, the tow truck?

A.     Right.

Q.     Tell the Judge what you saw the tow truck do at the time the little boy started into the street.

A.     Uh, he'd started to swerve to the left.

                    * * * * *

Q.     It would.  (Pause) Give the Judge an idea of how much time we're talking about from the time you first saw mother and child standing on the sidewalk til (sic) the time the truck hit the little boy.

A.     Not over 5 seconds, probably, 6 maybe.

Q.     And how much time was it from the time Jacob – from the time Jacob broke away from his mother and ran into the street until the time he was actually hit.

A.     Almost instantly.  I mean it, he covered the distance, you know I'm talking 10 or 12 feet, so across the lane there and it, uh, didn't take him long to run across there.

Q.     Do you have any estimate as to how long it took him to get from the curb to be hit by the truck?

A.     Two to three seconds, maximum.

                    * * * * *


**Mr. Hayes on Cross**

Q.     . . . at this point on Second Avenue is the ground relatively level where the tow truck was?

A.     . . . at what point?

Q.     . . . right where the, the, uh, tow truck struck, uh, Jacob and Ms. Leach.

A.     In the intersection it's fairly level.

                    * * * * *

Q.     . . . Was there anything blocking your view of the accident?

-8-

Q.     Well I could see the boy run off the sidewalk in front of the wrecker and I couldn't, couldn't see anything after that other than the wrecker swerving to the left and -

Q.     Okay. Did you see the wrecker actually strike Jacob Leach?

A.     No.

Q.     Okay, did you see it strike, uh, Ms. Leach?

A.     Not actually strike, I saw when she was thrown back through the air.

Q.     Okay. About how fast were you traveling when this happened, do you recall?

A.     Uh, probably less than 30 miles an hour.

Q.     Do you recall the tow truck was traveling, uh, approximately the same speed as you?

A.     Uh, probably a little bit less. I think I was, might have been gaining on him just a little bit coming down the hill and, like I said, I'd check my speed. He was, uh, uh, had pulled a hill and coming down and he wasn't moving very fast at all.

\* \* \* \* \*

Q.     Okay. Did the, did the truck driver do anything else to avoid hitting the child that you could see?

A.     Uh, all he could do was swerve to the left and hit his brakes. I don't - I can't think of anything else he could have done.

Q.     In your experience as a, as a tow truck driver was, is there anything in your mind that he could have done?

A.     Other than be somewhere else, no.

\* \* \* \* \*

Q.     Okay. Can you give me an estimate as to how far you were behind this, uh, tow truck when he slammed the brakes on, I know you said two or three car lengths, what does that translate into feet?

A.     About 50 feet or 60.

**Mr. Kellar**

\* \* \* \* \*

Q.     [H]ow long have you been a resident of Davidson County?

A.     63 years.

Q.     And that, your entire life, in other words?

A.     My entire life, yes sir.

Q.     Okay and, uh, in December 23rd as of December 96 were you employed?

A.     Yes sir.

Q.     Where were you employed?

A. Electric Service, Incorporated.

Q. And did you have occasion to be on Second Avenue South on December 23rd, 1996?

A. Yes sir.

Q. And what were you doing?

A. I was returning from a errand that I'd been on for the company.

Q. And did you witness an accident involving a small child that day?

A. I did.

Q. And where did that accident occur?

A. On Second Avenue just about Hart Street.

Q. And approximately what time of day was that?

A. Well I think it was somewhere along about midday.

Q. Alright. And was there a wrecker truck involved in that accident?

A. Yes sir.

Q. And, uh, where were you in relation to the wrecker truck when you first saw it?

A. I was about a 120 yards I imagine when I first saw it, or a 100, around a 100 or 120 yards.

Q. And where were you on Second Avenue at that time?

A. I was just above the little drive that's up on a hill.

* * * * *

Q. And about how fast were you going?

A. I was doing about maybe 20 or 25 mile an hour at that time.

* * * * *

Q. Okay and did you observe the, the wrecker truck prior to the collision, prior to the accident?

A. Just, just prior.

Q. Did it appear to you to be going at about the same speed you were?

A. Yes it wasn't, it didn't seem to be running off and leaving nobody you know it's, it seemed like about the same speed or a little, maybe there about.

* * * * *

Q. Mr. – tell me what you saw.

A. When I seen the little child enter the road I stopped just dead stopped and I was some, right below that little drive about, at that time, just below it, and uh, when I seen him enter the road, and when I, at that time he was, the little fella entered at an angel (sic) toward the wrecker and it was, it was pretty fast, I'm, you know, it's, it's, it's pretty quick whenever

-10-

something like this happens. It's not just something that, that happens and it looks like it's going to go on forever it's, but it just came together and the man tried to stop but and, uh, the little boy ran out in the street you know and I couldn't see him anymore when he got in front of the wrecker.

Q. Did you, excuse me, did you see the little boy before he ran out into the street?

A. I seen him when he left the sidewalk, yes sir.

Q. And he, nobody was holding him at that time?

A. He didn't have nobody a hold of him when he left the sidewalk as far as I could see. All I could see was him running out.

Q. Okay. Now did the truck try to swerve or did it continue on a straight path when the child ran into the street?

A. Well when I saw the truck go to stop it looked like it just sit down and turned to the side. You know it, it had to travel a little distance but it just, it just like it turned this a way.

* * * * *

### Keller on Cross

Q. Which way were they walking? South or north?

A. They were going south.

* * * * *

### Judge Questioning Keller

* * * * *

Q. Okay. When you first saw them, tell me again was the child?

A. When I first saw them the child had just about, just leaving the sidewalk.

Q. Uh, describe how the child was moving?

A. He was running wide-open, what all a little kid could do.

Q. You mean, when you say wide-open do you mean fast?

A. He was running, yes sir.

Q. Uh, and is there anyway you can estimate how long it took between the time the child left the sidewalk and you first saw the truck put on brakes?

A. Well when I saw what I saw, and I'm going to try to be as straight with you as I can, the truck when it got, it was, uh, it was just about to enter the, the intersection just before he got into the intersection. The boy was headed toward the truck crossways, not this away but vertical – you know

Q. On an angle.

A.  On an angle toward the truck and by the time that I saw the brakes coming on, you know I saw the truck to moving, the child had almost got in front of him, you know, so undoubtedly he couldn't see any better than – I'm not saying the man couldn't see but a little bitty feller like that that's running at an angle to you maybe he didn't see him as –

\* \* \* \* \*

Q.  Uh, did you notice which way the child was looking?

A.  No sir he just looked like he was headed straight toward the, uh, at this angle like he was wide-open going and he acted like he knew where he was going but I can't speculate that either.

The conclusions of the trial judge indicate that he held that Mr. Heer should have seen the child when he was 300 feet distant. At that distance, the child was with his mother, on the sidewalk, and we know of no rule of law, nor are we cited to any, which requires a motorist to assume that an escorted child will forcibly break away from the adult holding him and dart into the street. The trial judge found no evidence of excessive speed, which is fully supported by the record. There is no evidence that Mr. Heer failed to exercise due care, because the preponderance of the evidence clearly reveals that the child broke free of his mother and ran into the path of the truck. Mr. Heer was confronted with a sudden emergency, and even with the benefit of hindsight we can envision no effective evasive action different than the action taken by Mr. Heer. Even assuming that his duty of care and caution was heightened, owing to the residential nature of the area and his awareness that children were often present, the record reflects no evidence of negligence on his part. The trial judge alluded to the intervening act of the child, but made no finding about it, although the intervening act of a child may be "the responsible cause of his injury although he could not be held guilty of negligence." *Nashville, C. & St. L Ry. v. Harrell*, 110 S.W.2d 1032 (Tenn. Ct. App. 1973); *Stafford v. Consolidated Bus Lines*, 164 S.W.2d 15 (Tenn. 1942).

Other jurisdictions have addressed whether a heightened duty of care is diminished when a child is accompanied by an adult. The Louisiana Court of Appeals addressed the duty that a driver owes to a child who is accompanied by an adult in *Brown v. United States Fire Ins.*, 671 So.2d 1195 (La. Ct. App. 1996). In that case, a five-year-old and his ten-year-old brother, who lived with their maternal grandmother and their aunt in Louisiana, were involved in an accident. On the afternoon of the accident, the boys exited their school bus holding hands. Their aunt was on the sidewalk next to them and their grandmother was across the street at the front door of her house. After the boys had crossed in front of the bus the younger brother bit his older brother's hand and darted toward the street. The child was struck by the bus. The trial court found that the bus driver was not negligent because he could not be expected to maintain his view of the younger boy as he drove forward and because the bus driver could only reasonably assume that the child would remain on the porch with the grandmother and the brother. The Louisiana court cited *Scardin v. State Farm Mut. Auto Ins. Co.*, 597 So.2d 1148, 1150 (La. Ct. App. 1992), as explaining a motorist's duty of care when driving near children:

Although the duty of a driver charged with the knowledge of children near the roadway is heightened, the duty is not limitless. Upon seeing children near the roadside, a motorist is expected to react appropriately, but a driver does not necessarily have the duty to stop. Motorists driving near children are charged with a high degree of care, but the driver is not an insurer of every child's safety. When a driver has employed all reasonable precautions to avoid an accident, and a sudden act of a child creates an emergency rendering it impossible for the motorist to avoid striking the child, the accident is considered unavoidable and the motorist is not liable. In other words, if a motorist is preceding at a lawful and reasonable rate of speed, maintaining a proper lookout, and otherwise obeying the rules of the road, he will not be held liable for injuries to a child who suddenly darts or dashes into the path of his vehicle from a concealed position in such a way that an accident cannot be avoided. Each case must be considered in light of its particular set of circumstances.

However, when children are accompanied by their parents or other adults, the degree of care diminishes because it is only reasonable for a prudent person to assume, in the absence of any indication to the contrary, that the parent or other person will guard against a childish impulse and give immediate warning of any sudden change in position which might place the child in peril.

In *Tetterton v. Foggie*, 172 S.E.2d 369 (S.C. 1970), children were playing along the street when a ball crossed from one side of the street to the other. One of the children crossed the street to retrieve the ball. Upon seeing the children at play, the driver of the car slowed his vehicle and began honking his horn. At this time, the mother of the children held their hands and walked them back to the house. Before arriving at the house, one of her children jerked loose from her grip and darted into the path of the automobile. The court held that the evidence showed that the driver was observing the rules of the road with respect to speed, control, and maintaining a proper lookout while driving in his proper traffic lane. Further, it stated that:

he saw the minor . . . was in a place of safety and at the time was being held by an adult and it was only when he preceded to pass the area where the children were that the minor jerked loose from the adult . . . and darted into the path of the automobile . . . . It is our conclusion that the [Driver] exercised due care in the operation of his automobile with respect to the minor who was under adult supervision at the time of the accident.

The South Carolina Supreme Court then held that:

When a child, who is under adult restraint, breaks away from such adult and darts into the path of a motorist who is observing the rules of the road with respect to speed, control, and who is maintaining a proper lookout, the resulting injury to said minor is not actionable.

-13-

*See also* **Korbelik v. Johnson**, 227 N.W.2d 21, 25 (Neb. 1975) (noting the distinction between the duty of care owed to a child when unaccompanied by an adult and a child who is accompanied by an adult); **Sneed v. Satcher**, 597 So.2d 1070, 1076 (La. Ct. App. 1992).

We find that the evidence preponderates against the judgment which is reversed and the suit of the plaintiff is dismissed at her costs. The issue of comparative fault is pretermitted.

PER CURIUM